# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
February 7, 2006 Session

## STATE OF TENNESSEE v. DONALD WILLIAMS, JR.

**Appeal from the Criminal Court for Shelby County**
**No. 02-02640    Arthur T. Bennett, Judge**

---

**No. W2004-02355-CCA-R3-CD  - Filed May 17, 2006**

---

The appellant, Donald Williams, Jr., was indicted on one count of first degree murder, two counts of felony murder, especially aggravated robbery, especially aggravated burglary and arson. After a jury trial, the appellant was found guilty of second degree murder, two counts of felony murder, especially aggravated robbery and especially aggravated burglary. The trial court imposed life sentences for the two felony murder convictions, a twenty-five year sentence for the second degree murder conviction, a twenty-five year sentence for the especially aggravated robbery conviction and a twelve-year sentence for the especially aggravated burglary conviction. The trial court denied a motion for new trial. On appeal, the appellant argues that the trial court erred: (1) by refusing to grant a continuance; (2) by refusing to allow the appellant to question Officer Robert Shemwell about a potentially exculpatory witness; and (3) by admitting an excessively graphic photograph of the victim. The appellant also contends that the evidence was insufficient to support the verdict. Because the judgment forms do not reflect whether the sentences were imposed concurrently or merged for an effective life sentence, we remand the matter to the trial court for entry of corrected judgment forms to reflect that the convictions for felony murder and second degree murder are merged into one count of felony murder for an effective life sentence. In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES, and NORMA MCGEE OGLE, JJ., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Donald Williams, Jr.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Matthew Montgomery, the victim, lived alone at 3801 Kipling Avenue in Memphis. The victim was a disabled Vietnam veteran who suffered from paranoid-schizophrenia.

On July 7, 2001, the sixteen-year-old appellant was visiting Robert Phillips, also known as B.J., who lived across the street from the victim. Marcus Butler was also at B.J.'s house. After a discussion about robbing someone, the appellant, who was known as "Scoop," walked across the street with Mr. Butler to the victim's house. Mr. Butler asked the victim for money, and, according to Mr. Butler, as the victim handed over some change, the appellant reached over Mr. Butler's shoulder with a pistol and shot the victim. Mr. Butler immediately started to run from the scene and remembered hearing at least five shots. The appellant ran in a different direction. Mr. Butler and the appellant met later at a friend's house, and, after B.J. showed up, all three returned to B.J.'s house. Later that night, Mr. Butler saw someone wearing a black t-shirt going into the victim's house.

The next day, Michael Broady, the appellant's younger brother, went into the victim's house with the appellant. Mr. Broady saw the victim lying dead on the kitchen floor and saw that there was blood all over the house. Mr. Broady and the appellant found some rifles in the house which they loaded into the victim's car. The two later took the rifles and the victim's car to the home of their uncle, James Fenner. After taking the rifles, the appellant and Mr. Broady poured gasoline all around the inside of the house. The victim's neighbor, Dorothy Rome, saw three young men around the victim's house that day, and noticed that the victim's car was gone the morning of July 8, 2001.[1]

Later that evening, the appellant's mother called the Memphis Police Department to report a suspicious vehicle parked outside her house. Officer William Taylor checked the registration and determined that the vehicle, a white Dodge Neon, was registered to the victim but had not been reported stolen. Officer Taylor went to the victim's house and knocked on the door. Officer Taylor left because no one answered the door, and he did not notice anything suspicious.

On July 10, 2001, Ms. Rome noticed that the victim's vehicle was again parked in front of the victim's house. It was gone later that day. On July 10, Starkesha Alford purchased a white Dodge Neon from a man who introduced himself as "Scoop." She paid $300 for the vehicle and in exchange, "Scoop" gave her some registration papers with the name "Montgomery" on them. Several days later, when the police located the vehicle at Ms. Alford's residence, she identified a photograph of the appellant as the man who sold her the vehicle.[2]

---

[1] In a photospread at the police department, Ms. Rome was able to identify B.J. as one of the young men she saw at the victim's house. At trial, she was unable to identify the appellant as one of the men.

[2] Ms. Alford was unable to identify the appellant at trial, nearly three years later.

On the evening of July 12, 2001, Mr. Broady went back to the victim's house with the appellant. They filled two large garbage cans with items from the house, including ammunition and gun clips. They also took an air compressor. After they finished filling the garbage cans, Mr. Broady lit some underwear on fire and tossed it toward the victim's body. When Ms. Rome drove home that evening, she saw two young gentlemen pulling what appeared to be a heavy garbage can down the street in front of her house. Later that night, she heard what sounded like a fire alarm. After hearing the alarm, Ms. Rome saw police in front of the victim's house.

Fire Investigator Ranold Williams was called to the scene of the fire. He was able to determine that the fire started on the victim's body in the den/dining room area next to the kitchen. A gas can containing ignitable liquids was recovered from the scene. When the victim's body was discovered, the police department was notified, and a homicide investigation was initiated.

Officer Shan Allen Tracy was assigned to investigate the crime scene at the victim's house. He located a bullet hole in the front door and another hole in the wall behind the door. A bullet was lodged in the wall behind the front door. There was also a bullet fragment lodged in the front door and a spent bullet on the living room floor. There was a large amount of blood throughout the house and the victim was lying on the floor in the dining room near a mattress that was burned. A red gas can containing gasoline residue was found near the victim's body. According to Paulette Sutton, Assistant Director of Forensic Services at the Regional Forensic Center, the victim bled continuously and heavily throughout the house after being shot several times at the front door. The blood spatter throughout the home was consistent with arterial gushing.

Lieutenant Robert Shemwell of the Memphis Police Department was assigned as the case coordinator for the investigation into the victim's death. Several days after the victim's body was discovered, Lieutenant Shemwell went to the appellant's house and conducted a search of the premises. Lieutenant Shemwell recovered several items from the attic crawl space, including a chest full of videotapes, an air compressor, boxes of ammunition, a drop light, a computer and a remote control car. He also found two rings under the appellant's mattress. The victim's sister was able to identify all of the items as the victim's property.

On July 16, 2001, Lisa Marie Nichols called the Memphis Police Department to report that her brother, James Fenner, was in possession of several rifles. Officer Aaron Merritt collected the three rifles and turned them over to technicians for chemical processing. Seven of the fingerprints recovered from the rifles matched the appellant's fingerprints.

Sometime after the victim's death, Mr. Broady witnessed the appellant, Mr. Butler and B.J. burying a small handgun in the backyard at the appellant's house. Mr. Broady later dug up the gun and gave it to his uncle, James Fenner. Mr. Fenner turned the gun over to the police on July 18. After the TBI examined the gun, they concluded that the bullets fired at the scene were fired from the gun turned over to the police by Mr. Fenner.

The autopsy on the victim's body was performed by Dr. O.C. Smith, the medical examiner for Shelby County. Dr. Smith determined that the victim had been dead for three to four days and was dead prior to the start of the fire. Dr. Smith opined that the cause of death was multiple gunshot wounds. One bullet entered the victim's chin and traveled back and down through the victim's neck, severing the right jugular vein and right carotid artery. A second bullet entered the back of the victim's left elbow and lodged in the center of his elbow. According to Dr. Smith, the victim was not immediately incapacitated by his wounds and was able to move around for some period of time before his death.

The appellant was indicted in March of 2002 by the Shelby County Grand Jury for the death of the victim. In the multi-count indictment, the appellant was charged with first degree murder, murder during the perpetration of aggravated robbery, murder during the perpetration of aggravated burglary, especially aggravated robbery, especially aggravated burglary and arson. After a jury trial, the appellant was found guilty of second degree murder, two counts of felony murder, especially aggravated robbery, and especially aggravated burglary. The appellant was found not guilty of arson. The trial court sentenced the appellant to life in prison for each count of felony murder, twenty-five years for second degree murder, twenty-five years for especially aggravated robbery, and twelve years for especially aggravated burglary. The judgment forms do not reflect that the sentences were merged or whether the sentences were ordered to run concurrently or consecutively.[3]

---

[3]We realize that when an indictment charges both premeditated first degree murder and felony murder, the trial court should instruct the jury to return a verdict on both counts. See State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998). If convictions are returned on both counts, the convictions are to be merged by the trial court into a single conviction of first degree murder. State v. Price, 46 S.W.3d 785, 824-25 (Tenn. Crim. App. 2000). In other words,

> If the jury does return a verdict of guilt on more than one theory of first-degree murder, the court may merge the offenses and impose a single judgment of conviction. See State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). The benefits of instructing the jury in this manner are important. First, the double jeopardy problem of retrying a defendant after a subsequent appellate opinion reverses a conviction as unsupported by evidence is precluded. Second, the State will have a basis to protect other convictions to which it may be entitled. Third, in light of our decision in State v. Middlebrooks, 840 S.W.2d 317 (1992), a jury verdict on each charged offense will allow the State to use the felony murder aggravator as an aggravating circumstance in sentencing. See State v. Hall, 958 S.W.2d 679, 692-93 (Tenn. 1997).

State v. Howard, 30 S.W.3d 271, 275 n.4 (Tenn. 2000). Thus, in the case herein, when the jury returned a verdict of guilt as to both counts of felony murder, the trial court should have merged those two counts into one count of felony murder. Further, in order to satisfy double jeopardy concerns, the trial court should have merged the lesser offense of second-degree murder into the greater offense of felony murder. See State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997); State v. Banes, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993); see also State v. Zirkle, 910 S.W.2d 874, 889 (Tenn. Crim. App. 1995). Consequently, we must remand the matter to the trial court for entry of judgment forms which reflect that the second degree murder conviction and two felony murder convictions merge into one felony murder conviction with an effective life sentence.

The appellant subsequently filed a motion for new trial, which was denied. The appellant then filed a timely notice of appeal. The following issues are presented for our review: (1) whether the trial court erred in denying a continuance; (2) whether the trial court erred in refusing to allow the appellant to question Lieutenant Shemwell about a potentially exculpatory witness; (3) whether the trial court erred by admitting an excessively graphic photograph of the victim; and (4) whether the evidence was sufficient to support the appellant's convictions.

Analysis

Denial of Continuance

The appellant first contends that the trial court erred in denying his oral motion for continuance made at trial. Specifically, the appellant contends that the State "failed to provide counsel with exculpatory material and reports" and that in response the trial court "refused to reset the case without even giving counsel the opportunity to attempt to find the exculpatory witness referenced twice in the materials." Further, the appellant contends that he was prejudiced by the trial court's actions because the exculpatory witness "could have been an eyewitness to the crime." The State disagrees, arguing that the trial court did not abuse its discretion and that the appellant has failed to show that he was prejudiced by the trial court's ruling.

The granting of a continuance rests within the sound discretion of the trial court. State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the denial of the continuance denied the defendant a fair trial. Id. Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice. Odom, 137 S.W.3d at 589. This Court has recognized that a continuance might be appropriate in order to afford a defendant a "reasonable opportunity" to locate a witness. State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). However, the burden rests with the defendant to show that a continuance might have reasonably resulted in locating the witness. Id.; see also Brown v. State, 489 S.W.2d 855, 857 (Tenn. Crim. App. 1972).

On the first day of the trial proceedings herein, during jury selection, the State gave the appellant's counsel some supplemental police reports that were apparently overlooked during discovery. Counsel for the State acknowledged that the reports should have been supplied in response to the appellant's Rule 16 motion because they contained notes of interviews with the appellant. In the reports, counsel for the appellant also found references to a girl named "Sherry" who told an anonymous caller that she was told that someone other than the appellant shot the victim. Counsel for the appellant requested a continuance to locate "Sherry" and possible exculpatory evidence which would result from her testimony.

In a jury-out hearing on the matter, Lieutenant Robert Shemwell testified that on July 14, 2001, he received a phone call from an anonymous caller who claimed that "Sherry" told her that B.J. was the person who shot and robbed the victim. The caller described "Sherry" as a sixteen-year-old female who overhead a conversation between B.J. and someone else. In a second phone call, the same anonymous caller told Lieutenant Shemwell that "Sherry" was working at a Summer Youth Program in Memphis. Lieutenant Shemwell sent investigators to find "Sherry," but they were unable to find her or even verify that her name was "Sherry." Although the police department actively pursued B.J. as a suspect in the crimes, they could not corroborate the co-defendant's statements about B.J.'s involvement.

After hearing the testimony of Lieutenant Shemwell and the arguments of counsel, the trial court denied the motion for a continuance. In reaching its decision, the trial court voiced concern that "Sherry," if she existed, could be located nearly three years after the crime and whether, if located, would provide any exculpatory evidence. The trial court commented:

> If I thought - if I thought that you would be able to get - come up with something that would be beneficial at this point I would not hesitate to continue the case, but it appears to me that we just don't have enough at this point to say that we need to stop this case and do further investigation on the matter because it's a shot in the dark right now.

After reviewing Lieutenant Shemwell's testimony, we conclude that the trial court did not abuse its discretion in denying the continuance. The appellant was unable to present any evidence that indicated that "Sherry" could be located almost three years after the anonymous phone call or that "Sherry" would have given any information which would exculpate the appellant. Further, at the hearing on the motion for new trial, the appellant did not present any further evidence regarding the whereabouts of the potentially exculpatory witness and did not present evidence indicating that the outcome of trial would have been different had a continuance been granted. Thus, the appellant failed to show prejudice as a result of the denial of the continuance. This issue is without merit.


Questioning of Lieutenant Shemwell


Next, the appellant contends that the trial court erred by refusing to allow him to elicit hearsay testimony from Lieutenant Shemwell as a remedy for the State's failure to timely provide supplemental police reports in response to a discovery request. Specifically, the appellant contends that counsel "should have been allowed to question Shemwell about the hearsay statements from an exculpatory witness" because "the trial court did not give the defense any remedy whatsoever for the [sic] this horrible breach of the discovery rules." The State argues that the appellant waived the issue for failure to cite authority that would give the trial court the authority to fashion such a remedy.

While the appellant complains that the trial court erred by refusing to allow him to question Lieutenant Shemwell about the possible exculpatory witness, we interpret the appellant's argument as an argument that the State violated Rule 16 of the Tennessee Rules of Criminal Procedure and the appellant's rights to due process by failing to disclose the supplemental reports and potential exculpatory witness during discovery.

In Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to establish a due process violation under Brady, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Brady does not require the prosecution "to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

This Court has stated that in order to establish a Brady violation, the information need not be admissible, only favorable to the defendant. See State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (1978)). This Court will deem evidence material if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. See United States v. Bagley, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. at 682 (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)).

Rule 16(a)(1) of the Tennessee Rules of Criminal Procedure governing discovery, in part, provides:

> (A) Statement of Defendant.--Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody

or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general; the substance of any oral statement which the state intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law-enforcement officer[.]

If a party fails to comply with a discovery request, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). When arguing that the State violated Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).

Looking first to the factors necessary to determine if a Brady violation exists, we note that the appellant filed a motion for discovery well in advance of trial. The State acknowledged during jury selection that the supplemental reports should have been provided to the appellant in response to the initial discovery request. Thus, the State admitted that it improperly withheld the information from the appellant, satisfying the first prong of the Brady analysis. Further, the information regarding the potentially exculpatory witness was clearly beneficial to the appellant. Indeed, the State was required to turn over any potentially exculpatory evidence and any statement of the appellant to the appellant during discovery. However, we cannot conclude that the information was material or that the appellant was prejudiced by the State's failure to disclose the information. The appellant has not shown a reasonable probability that the outcome of the trial would have been different had he known of the supplemental reports at the appropriate time. The appellant did not produce "Sherry" at the hearing on the motion for new trial, admitted that the State did not intend to, and he did not attempt to use his own statements at trial. Thus, we find no Brady violation. We do, however, acknowledge that the State was guilty of violating Rule 16 of the Tennessee Rules of Criminal Procedure. The appellant suggests that the trial court should have temporarily suspended the hearsay rules in order to allow the questioning of Lieutenant Shemwell as a remedy to the State's violation of Rule 16. It is arguable that Rule 16(d)(2) permits the suspension of the hearsay rules by the trial court in response to a violation of the rules. However, in view of the fact that the evidence the appellant sought to introduce through Lieutenant Shemwell was at least triple hearsay, i.e. an anonymous caller claiming that "Sherry" told her that "Sherry" was told by someone else that the appellant did not commit the crime, we are not willing to hold today the rule contemplates permitting the trial court to allow the introduction of patently unreliable hearsay into evidence as a remedy to the State's violation of the rule where the appellant failed to show that a "substantial prejudice" resulted from the non-compliance with the rule. See e.g.,U.S. v. Adeniji, 31 F.3d 58, 64-65 (2d Cir. 1994) (holding that where Government violated Federal Rule of Criminal Procedure 16 by failing to disclose acknowledgment of ownership of suit jackets found filled with cocaine by defendant to agent, district court did not err in failing to strike the testimony of the agent where the defendant failed to show substantial prejudice resulted from non-disclosure); U.S. v. Taylor, 13 F.3d

986, 991-92 (6th Cir. 1994) (determining that defendant failed to show substantial prejudice resulted from failure to disclose test results); U.S. v. Sanchez, 912 F.2d 18, 21 (2d Cir. 1990) (concluding that defendant failed to show "cognizable" prejudice resulted from non-disclosure of evidence). Thus, despite the State's failure to comply with the rule, we conclude that the appellant did not show that the failure to receive the information significantly hindered the preparation for trial or the defense utilized at trial or resulted in "substantial prejudice" to the appellant. Consequently, while the State's failure to disclose the information is a technical violation of the rule, given the nature of the hearsay, the trial court did not abuse its discretion in failing to issue a sanction against the State for failure to comply with the rule. This issue is without merit.

<u>Introduction of Photograph of Victim</u>

Next, the appellant complains that the trial court erred in admitting into evidence a photograph taken of the crime scene that shows the victim's body. Specifically, the appellant contends that the photograph was excessively graphic and that the probative value of the photograph was substantially outweighed by the danger of unfair prejudice. The State disagrees.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Robinson, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401. See, e.g., Banks, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; see also Banks, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and their prejudicial effect is outweighed by their probity. Banks, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Banks, 564 S.W.2d at 951 (citing Milam v. Commonwealth, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is one entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. Id. at 949; State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

In the case herein, the trial judge conducted a jury-out hearing after objection by the appellant prior to the admission of the contested photograph during the testimony of Paulette Sutton, the blood stain pattern expert. Upon reviewing all of the photographs that the State intended to introduce

during the testimony of Ms. Sutton, the trial court weighed the prejudicial effect of the introduction of the photograph showing the victim's body with the probative value and made a determination that the photograph was admissible. The trial court determined that the photograph did not "fall into the category of gruesome or inflammatory or anything like that."

The record contains multiple photographs that show the massive amount of blood throughout the victim's house and the fire created in the victim's home, including a photograph of the victim lying on the floor. The photograph of the victim's body was not a close-up shot; it showed the victim lying on his side in the room where he died and was later burned. The photograph was used at trial during Ms. Sutton's testimony to describe the blood spatters found throughout the house and to explain to the jury how the victim moved through the house after he was shot prior to his death. There were other photographs of the victim's body introduced during the testimony of the medical examiner to illustrate the location and nature of the wounds sustained by the victim which were arguably more graphic than the photograph introduced during Ms. Sutton's testimony which showed the victim lying on the floor. See State v. Smith, 868 S.W.2d 561, 576 (Tenn. 1993) (holding that trial court did not abuse its discretion in allowing autopsy photograph of victim during guilt phase of trial in part to illustrate Medical Examiner's testimony).

We determine that the picture was certainly relevant to show the nature of the victim's injuries. We have viewed the photograph and conclude that while unpleasant, the probative value of the photograph was not substantially outweighed by danger of unfair prejudice. Under these circumstances we cannot say the trial judge abused his discretion in admitting the photograph. This issue does not merit reversal.

Sufficiency

Lastly, the appellant challenges the sufficiency of the evidence in regards to his convictions for felony murder and second degree murder.[4] Specifically, he contends that "no rational trier of fact could have found the Defendant guilty with . . . [the] testimony" presented at trial because the "only eyewitness who testified [Mr. Butler] . . . was obviously lying about every other aspect of his testimony, and therefore, cannot be found to be credible." Moreover, the appellant argues, "the other two eyewitnesses make it clear that B.J. (Robert Phillips) was the real responsible party, which has been the defense's theory in the case all along." The State contends that the jury properly resolved any conflicts in or challenges to the testimony of the witness and that the evidence was more than sufficient to support the verdict.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all

---

[4]The appellant does not contest the validity of his convictions for especially aggravated burglary and especially aggravated robbery. In fact, in his brief, the appellant states that he "never contested that he and the other boys referred to in the trial removed items from the victim's house over the course of the four or five days following his death."

conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Moreover, questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are to be resolved by the trier of fact. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1991).

To obtain a conviction for first degree felony murder, the State had to prove "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy [.]" Tenn. Code Ann. § 39-13-202(a)(2). Tennessee Code Annotated section 39-13-202 also provides that "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts." Tenn. Code Ann. § 39-13-202(b). Additionally, the death must occur "in the perpetration of" the enumerated felony. State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted). The killing may precede, coincide with, or follow the felony and still be in the perpetration of the felony, so long as there is a connection in time, place, and continuity of action. State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107. A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. Tenn. Code Ann. §§ 39-13-201, -210(a). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b).

Having carefully reviewed the record, we conclude that the evidence is sufficient to support the jury's verdict in this case. Viewed in the light most favorable to the State, the proof at trial establishes that the victim was killed during a robbery/burglary. Mr. Butler testified that the group discussed robbing someone, then went across the street and asked the victim for money. At that time, the victim gave Mr. Butler some money and the appellant pulled out a handgun and began

firing shots at the victim. Mr. Butler later saw the appellant burying the gun in his backyard. Mr. Butler retrieved the gun, and it was later turned over to police. Ballistics tests indicated that the bullets recovered from the crime scene and from the victim were fired from the gun that was buried in the appellant's backyard. Further, there was testimony from Mr. Broady that he and the appellant went back to the victim's home after the murder and took items including ammunition and an air compressor. There was testimony from the blood spatter expert that several items inside the home were moved after the victim died. Further, Ms. Rome saw several young men removing items from the victim's home, and the items were later discovered in the attic crawl space of the appellant's house. The jury is responsible for determining the credibility of the witnesses. Obviously, the jury believed the testimony of Mr. Butler, Mr. Broady and Ms. Rome. There was sufficient evidence for the jury to convict the appellant. This issue is without merit.

<u>Conclusion</u>

For the foregoing reasons, the matter is remanded to the trial court for entry of corrected judgment forms as stated in this opinion. In all other respects, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE